UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Academy of Doctors of Audiology,

      Plaintiff,

v.                                              Civil Case No . 16-13839

International Hearing Society,          Sean F. Cox
                                        United States District Court Judge

      Defendant.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANT'S MOTION TO DISMISS**
**AND DENYING PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION AS MOOT**

      In December of 2016, Defendant International Hearing Society held a training program on tinnitus care in Orlando, Florida.  Defendant's program description states that Defendant will provide a "Tinnitus Care Provider Certificate" to certain persons who complete the program and pass an examination.

      Before the program was actually held, Plaintiff Academy of Doctors of Audiology brought this action against Defendant, asserting false advertising claims under the Lanham Act and Michigan common law, and a claim under the Michigan Consumer Protection Act.  The sole relief sought by Plaintiff is a preliminary and permanent injunction barring Defendant from issuing a certificate to some of the persons who attended that program, specifically, hearing aid dealers.

      Currently pending before the Court are: 1) Plaintiff's Motion for Preliminary Injunction; and 2) a Motion to Dismiss filed by Defendant.  Defendant's Motion to Dismiss challenges

1

Plaintiff's standing to bring this action and also asserts that Plaintiff's Complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6). The motions have been fully briefed by the parties. The Court finds that oral argument would not aid the decisional process. *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. The Court therefore orders that the motions will be decided upon the briefs.

As explained below, the Court shall GRANT Defendant's Motion to Dismiss. Defendant's motion raises a facial attack to standing – which challenges the sufficiency of the allegations in the complaint. Plaintiff, as the party invoking federal jurisdiction, bears the burden to demonstrate standing and it must plead its components with specificity. Plaintiff has failed to do so. First, Plaintiff contends in its response brief that it has standing on its own to bring this case, based upon a "diversion of resources" theory. But there are no allegations in the complaint to support that theory. Second, Plaintiff contends that it has organizational or representative standing to bring this action on behalf of its members. In order to have such standing, Plaintiff's members must have standing themselves. As explained below, ADA has failed to do so because it has failed to sufficiently allege the injury-in-fact component, and because it is not likely that Plaintiff's members' claimed injury will be redressed by the injunction sought here.

In addition, although the Court need not reach of any Defendant's 12(b)(6) challenges, the Court concludes that Plaintiff's claims would also be properly dismissed as to those challenges. For example, Plaintiff fails to state a claim under Michigan's Consumer Protection Act because the conduct at issue here does not involve consumer purchases (purchases made primarily for personal, family, or household purposes); instead it involves the issuance of a

certificate in connection with a business seminar.  Plaintiff's "contributory false advertising" claim under the Lanham Act is subject to dismissal because the Sixth Circuit has not recognized such a claim.  Finally, Plaintiff's false advertising claim under the Lanham Act fails for multiple reasons.

## BACKGROUND

On October 28, 2016, Plaintiff Academy of Doctors of Audiology ("Plaintiff" or "ADA") filed this action against Defendant International Hearing Society ("Defendant" or "IHS") in federal court, based upon federal-question jurisdiction and diversity jurisdiction.  Plaintiff's Complaint asserts the following claims: 1) "FIRST CLAIM (False Advertising –  Lanham Act);" 2) "SECOND CLAIM (Contributory False Advertising – Lanham Act);" 3) "THIRD CLAIM (Deceptive Trade Practices under M.C.L. § 445.903(1)(a)-(c));" and 4) "FOURTH CLAIM (Unfair Competition under Michigan Common Law)."  Plaintiff's Complaint requests the following relief:

### REQUESTS FOR RELIEF

Wherefore ADA requests the following relief against IHS:

A.    Judgment granting preliminary and permanent injunctions against IHS and all persons affiliated with it as set forth in Fed. R. Civ. Proc. 65(d)(2)(A), (B) and (C), prohibiting the issuance by IHS of a "Tinnitus Care Provider Certificate" to Hearing Aid Dealers (persons licensed under M.C. L. §§ 339.1301 et seq. or the comparable statutes of other States);

B.    ADA's costs, reasonable attorney fees and expenses of litigation; and

C.    Such other and further relief to which ADA may be found to be entitled upon the evidence and law.

(D.E. No. 1 at Pg ID 16).

On November 16, 2017, Plaintiff filed a Motion for Preliminary Injunction.  Thereafter,

3

the Court brought the parties in for a Status Conference on November 18, 2016.  The parties

believed that they had reached an agreement that would resolve the Motion for Preliminary

Injunction and Plaintiff then withdrew the motion on the record that day.

On November 22, 2016, the Court issued a Scheduling Order in this action that provides

that discovery closes on May 18, 2017, and the deadline for filing motions is June 19, 2017.

On December 15, 2016, Plaintiff's filed a Renewed Motion for Preliminary Injunction.

(D.E. No. 12).  Defendant filed a response to that motion (D.E. No. 14), and Plaintiff filed a

reply.  (D.E.  No. 16).  Thus, the motion has been fully briefed.

On December 20, 2016, Defendant filed a Motion to Dismiss.  (D.E. No. 13).  Plaintiff

filed a response to that motion (D.E. No. 15), and Defendant filed a Reply.  (D.E. Nl. 17).  Thus,

this motion has also been fully briefed.

## ANALYSIS

Defendant's Motion to Dismiss asks this Court to dismiss all of Plaintiff's claims in this

action.  If the Court were to grant that motion, then Plaintiff's Motion for Preliminary Injunction

would be moot.  In addition, the motion raises a standing challenge and if this Court determines

that Plaintiff lacks standing to bring this action, the Court should not proceed any further and

should dismiss the case.  As such, the Court considers this motion first.

**I.       Standard Applicable To Defendant's Motion To Dismiss**

Defendant's motion challenges Plaintiff's standing to bring this action and also asserts

that Plaintiff fails to state a claim upon which relief may be granted.   Thus, Defendant brings the

instant Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

"Standing is, of course, a threshold requirement for federal jurisdiction.  If a party does

4

not have standing to bring an action, then the court has no authority to hear the matter and must dismiss the case." *Binno v. American Bar Assoc.*, 826 F.3d 338, 344 (6th Cir. 2016). Thus, this Court should "consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdiction." *Wayside Church v. Van Burden Cty.*, __ F. 3d __, WL _____ at *___ (6th Cir. Feb. 10, 2017).

As explained by the Sixth Circuit, subject-matter-jurisdiction challenges under Fed. R. Civ. P. 12(b)(1) come in two varieties: a facial attack and a factual attack. *Id.* (citations omitted). A facial attack – like the one IHS makes in its motion – "questions merely the *sufficiency of the pleading*." *Id.* (emphasis added). When reviewing such a facial attack, a district court takes the factual allegations in the complaint as true, just as in a Rule 12(b)(6)[1] motion. *Id.*

Thus, in reviewing IHS's challenge to standing, this Court considers only ADA's complaint and its exhibits. *Id.; Binno,* 826 F.3d at 344. ADA, as the party invoking federal jurisdiction, bears the burden to demonstrate standing and it must "plead its components with specificity." *Id.*

## II.    Plaintiff's Complaint

Plaintiff ADA filed its Complaint on October 28, 2016. Plaintiff has not sought leave to file an amended complaint, even after Defendant's filed their Motion to Dismiss which challenges the sufficiency of Plaintiff's Complaint.

---

[1]To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

**General Factual Allegations**

"Hearing health care is provided in the United States mainly by three categories of persons, with different levels of training and state-licensed scopes of practice: 1) Medical Doctors, especially otolaryngologists, who specialize in diseases of the ear; 2) Audiologists and 3) Hearing Aid Dealers, as they are called in Michigan (in other states variously called Hearing Instrument Specialists, Hearing Instrument Dispensers, Hearing Instrument Dealers, Hearing Aid Dispensers, or Hearing Aid Specialists, all here referred to as "Dealers" regardless of state-specific title)." (Compl. at ¶ 9).

"Medical Doctors are generally required to receive undergraduate and medical school degrees and to complete internship and residency. They have unlimited scopes of practice, including the treatment of tinnitus." (*Id*. at ¶ 10).

"Audiologists provide professional clinical services related to the prevention of hearing loss and the audiologic identification, assessment, diagnosis, and treatment of persons with impairment of auditory and vestibular (balance) function, and to the prevention of impairments associated with them. Their licensed scopes of practice encompass those activities. Audiologists assess and provide audiologic treatment for persons with tinnitus using techniques that include, but are not limited to, biofeedback, masking, hearing aids, education, and counseling. (Source: American Academy of Audiology.)." (*Id*. at ¶ 11).

"Audiologists entering the profession since 2007 have generally been required for licensure in Michigan and the other States to hold an undergraduate degree and the degree of Doctor of Audiology (Au.D.), usually requiring four years of postgraduate education, including a clinical externship. Prior to the universal Au.D. entry-level requirement, audiologists generally

6

held an undergraduate degree and a two-year Masters degree or a Ph.D. in Hearing Sciences. Some audiologists continue to practice under pre-Au.D. licenses and their associated academic degrees." (*Id*. at ¶ 12).

"Dealers in Michigan (like Dealers in the other States through similar statutes) are licensed pursuant to M.C.L. §§ 339.1301 et seq., to engage in the sale or offering for sale at retail of hearing aids. 'Hearing aid' means an instrument or device designed for regular and constant use in or proximate to the human ear and represented as aiding or improving defective human hearing. The 'Practice of selling or fitting a hearing aid' means the selection, adaptation, and sale of a hearing aid and includes the testing of hearing by means of an audiometer and other means for the sale of a hearing aid. The practice also includes the making of an impression for an ear mold." (*Id.* at ¶ 13).

"In Michigan, as is typical of other States, a Dealer may be licensed if the Dealer is a graduate of an accredited high school or secondary school, has served as a salesperson under a licensed Dealer for two years and passes a written examination. M.C.L. § 339.1305. (In a few States, a two-year post-secondary degree is required, in other States the requirements are even lower than in Michigan.)" (*Id.* at ¶ 14).

Defendant "IHS is a Michigan non-profit corporation with its principal place of business at 16880 Middlebelt Road Livonia, Michigan 48154. There are approximately 3,000 members of IHS, in Michigan and throughout the United States. *A very large proportion of IHS members are Hearing Aid Dealers (as designated in Michigan)* and IHS seeks to further their interests. *IHS members provide services for the testing, selection and fitting of hearing aids, as well as ongoing follow-up care and counseling.* Individuals who have met the standards and requirements

established by the current IHS bylaws and Code of Ethics are designated by IHS as Hearing

Instrument Specialists®."  (Compl. at ¶ 2) (emphasis added).

Plaintiff "ADA is a Pennsylvania non-profit corporation with its principal place of

business at 446 E. High St., Suite 10, Lexington, Kentucky 40507. ADA is *dedicated to the*

*advancement of audiology practitioner excellence,* high ethical standards, professional autonomy

and *sound business practices in the provision of quality audiology care*. ADA has approximately

1,500 members in Michigan and throughout the United States. *It brings this action in its*

*organizational capacity to further its objectives and those of its members in connection with the*

*treatment of tinnitus*, including those concerning high ethical standards and the protection of the

public."  (Compl. at ¶ 1) (emphasis added).

Notably, the Complaint does not include allegations as to the professions or educational

backgrounds of ADA's own members (ie., it does not allege whether its members are medical

doctors, audiologists, Dealers, other audiology practitioners, or all of the above).  The Complaint

alleges that ADA's members have "objectives" "in connection with the treatment of tinnitus."

Unlike the allegations about IHS's members, the Complaint lacks allegations as to what services

ADA's members provide to their patients (assuming they treat patients in a practice setting) or

whether they provide tinnitus care to patients.

"As described on the website of the American Tinnitus Association ("ATA"):

'Tinnitus is the perception of sound when no actual external noise is
present. While it is commonly referred to as "ringing in the ears," tinnitus can
manifest many different perceptions of sound, including buzzing, hissing,
whistling, swooshing, and clicking. In some rare cases, tinnitus patients report
hearing music. Tinnitus can be both an acute (temporary) condition or a chronic
(ongoing) health malady.
Millions of Americans experience tinnitus, often to a debilitating degree,
making it one of the most common health conditions in the country. The U.S.

8

Centers for Disease Control estimates that nearly 15% of the general public —
over 50 million Americans — experience some form of tinnitus. Roughly 20
million people struggle with burdensome chronic tinnitus, while 2 million have
extreme and debilitating cases.

In general, there are two types of tinnitus:

Subjective Tinnitus: Head or ear noises that are perceivable only to the
specific patient. Subjective tinnitus is usually traceable to auditory and
neurological reactions to hearing loss, but can also be caused by an array of other
catalysts. More than 99% of all tinnitus reported tinnitus cases are of the
subjective variety.

Objective Tinnitus: Head or ear noises that are audible to other people, as
well as the patient. These sounds are usually produced by internal functions in the
body's circulatory (blood flow) and somatic (musculo-skeletal movement)
systems. Objective tinnitus is very rare, representing less than 1% of total tinnitus
cases.

There is currently no scientifically-validated cure for most types of
tinnitus. There are, however, treatment options that can ease the perceived burden
of tinnitus, allowing patients to live more comfortable, productive lives.'

(*Id.* at ¶ 15).

"Treatment of tinnitus is within the licensed scope of practice of Medical Doctors and

Audiologists in Michigan and every other State. Treatment of tinnitus is not within the licensed

scope of practice of Dealers in Michigan and the other States, except for North Carolina.

N.C.G.S.A. § 93D-1.1." (*Id.* at ¶ 16).

"Treatment of tinnitus is complex, currently lacks some areas of research-backed

effectiveness data and is evolving. Tinnitus, in some cases, can be a symptom of a more serious

medical or surgical condition. There are significant risks to patients in tinnitus treatment. See,

*Clinical Practice Guideline: Tinnitus* (American Academy of Otolaryngology, 2014), attached as

Exhibit 1. While the Guideline notes that case management and evaluation may be provided by

non-physicians such as Audiologists, *Guideline* at *S3*, it makes reference to Dealers limited only

to potentially custom fitting hearing aids, at *S20*." (*Id.* at ¶ 17).

"'Sound Masking Devices' are potentially useful in the treatment of tinnitus. As

9

described by the ATA, "These are devices or applications that provide generic background noise — often white noise, pink noise, nature sounds or other ambient, subtle sounds. The noise generated by sound machines can partially or fully mask a patient's perception of tinnitus, providing relaxation and temporary respite from the condition." *Id.* at ¶ 18).

"Hearing aids may also potentially alleviate symptoms of tinnitus. Further, as described by the ATA, "Many hearing aids now come with integrated sound generation technology that delivers white noise or customized sounds to the patient on an ongoing basis. These devices combine the benefits of a hearing aid with those of other sound therapies, and are particularly well suited for tinnitus patients with measurable hearing loss. Also, because of the portable nature of these devices they can provide semi-continuous use and more consistent benefit throughout the day.'" (*Id.* at ¶ 19).

"Hearing aids are regulated by the United States Food and Drug Administration, 21 CFR Part 874. Sound masking devices incorporated into hearing aids, or 'Tinnitus Maskers,' are likewise regulated by the FDA as a Class II Prosthetic Device, 21 CFR § 874.3400. Tinnitus Maskers may only be sold with patient labeling regarding 'Hearing health care professional diagnosis, fitting of the device and followup care,' *id.*, (1). A Tinnitus Masker may only be sold on the prescription or order of a practitioner licensed by the applicable State to order such use. 21 CFR § 801.809. Thus, only Medical Doctors and Audiologists may order such use, other than in North Carolina, where Dealers may do so." (*Id.* at ¶ 20).

"IHS intends to offer a 'Tinnitus Care Provider Certificate' ('the Certificate'), in conjunction with a training program to be offered December 2-3, 2016, in Orlando, Florida ('the Program'). The Program is open to Dealers from every State. See, Program description attached

as Exhibit 2. While the description advises participants to check what are permitted practices as to tinnitus care under their state licensure, IHS intends to issue the Certificate to Dealers who meet the experience requirements and successfully complete the training, as shown by passing an examination, regardless of whether they are licensed to provide tinnitus care." (*Id.* at ¶ 21).

"As to Dealers licensed by Michigan and every other State except North Carolina, the Certificate will falsely or misleadingly convey to the public that the Dealer holding it is legally permitted to provide tinnitus care. *There is a substantial risk that such Dealers will display and advertise the Certificate to the public, resulting in members of the public seeking tinnitus care from them and being provided such care illegally*." (*Id.* at ¶ 22) (emphasis added).

"The Program will not provide Dealers with sufficient knowledge and skill to provide appropriate tinnitus care, given their limited education, training and experience. For that reason, the Certificate will falsely or misleadingly convey to the public that the Dealer holding it is competent to provide tinnitus care. There is a substantial risk that such Dealers will display and advertise the Certificate to the public, resulting in members of the public seeking tinnitus care from them and receiving inadequate such care." (*Id.* at ¶ 23).

"The public will thus be harmed by the issuance of the Certificate to Dealers. *The members of ADA will be harmed by the diversion of tinnitus care patients to Dealers holding the Certificate. The organizational purpose of ADA to ensure the provision of ethical and high quality hearing health care to the public will be defeated.*" (*Id.* at ¶ 24) (emphasis added).

**False Advertising Claim Under Lanham Act (Count I)**

ADA's first claim is a false advertising claim under Section 43(a)(1)(B) of the Lanham

11

Act, 15 U.S.C. § 1125(a)(1)(B).  ADA alleges that the Certificate will falsely or misleadingly communicate that a Dealer (other than one in North Carolina) holding it: 1) is legally permitted to provide tinnitus care; and 2) is competent to provide tinnitus care.  (Compl. at ¶¶ 26-27).

### Contributory False Advertising Under Lanham Act (Count II)

ADA's second claim is a contributory false advertising claim under the Lanham Act. ADA claims that the issuance of the Certificate by IHS will induce Dealers (other than those in North Carolina) who receive it to advertise falsely that: 1) they are legally permitted to provide tinnitus care; and 2) they are competent to provide tinnitus care.  ADA claims that, unless enjoined, IHS will issue the Certificate to Dealers who are not legally or competently able to provide tinnitus care, but who nevertheless are likely to display and advertise the Certificate to the public to attract business. ADA alleges that IHS will thereby "in connection with goods or services, induce the use interstate commerce of words, terms, names, symbols, devices, and combinations thereof, false or misleading descriptions of fact, and false or misleading representations of fact, which in commercial advertising or promotion, misrepresent the nature, characteristics and qualities of such Dealers' goods, services and commercial activities, in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)."  (Compl. at ¶ 38).

### Claim Under Mich. Comp. Laws § 445.903(1)(a)-(c) (Count III)

As its third claim, ADA asserts a state-law claim under Michigan's Consumer Protection Act, Mich. Comp. Laws § 445.903 *et seq*.  Specifically, ADA alleges that the issuance of the Certificate to Dealers will be a "deceptive, unconscionable or deceptive method, act and practice in trade or commerce, in violation of" Mich. Comp. Laws § 455.903(1)(a)-(c).

12

**Unfair Competition Under Michigan Common Law (Count IV)**

As its fourth claim, ADA asserts that the issuance of the Certificate to Dealers will be unfair competition, in violation of Michigan common law.

**Relief Requested**

Although ADA's Complaint contains four different claims, the only relief sought by ADA is an injunction against IHS issuing the Certificates to Dealers.  (*Id*. at 16).  Specifically, Plaintiff's Complaint requests that this Court grant "preliminary and permanent injunctions against IHS and all persons affiliated with it as set forth in Fed. R. Civ. Proc. 65(d)(2)(A), (B) and (C), *prohibiting the issuance by IHS of a "Tinnitus Care Provider Certificate"* to Hearing Aid Dealers (persons licensed under M.C. L. §§ 339.1301 et seq. or the comparable statutes of other States)" (Compl. at 16) (emphasis added).

ADA's Complaint does not attach a copy of the Certificate.  IHS's brief states that the Certificates "have not yet been drafted."  (Def.'s Br. at 15).

**The Program Description Referenced In, And Attached To, ADA's Complaint**

ADA's Complaint referenced and attached a program description for IHS's program in question.  (Ex. 2 to ADA's Compl.).  It is titled, "The International Hearing Society is proud to present the Tinnitus Care Provider Certificate Program" on December 2-3, 2016 in Orlando, Florida.  (*Id*. at 1).  It states, in pertinent part:

> The International Hearing Society is a new two-day workshop and assessment to learn ho to help your patients with tinnitus.  This comprehensive curriculum focuses on tinnitus patient care involving physiology, psychology, measurement, treatment and practice organization.  A Tinnitus Care Provider certificate will be awarded only to those participants who attend the workshop and meet the passing standard of the assessment.
> . . . .
> Who should participate?

This program is for hearing care practitioners* who want to advance their knowledge and clinical skills to help people suffering from tinnitus, and who are licensed as a hearing aid specialist (or hearing instrument practitioner), audiologist, and have at least two (2) years of clinical experience post-licensure. Students in the hearing healthcare profession may attend the workshop and sit for the assessment. Upon obtaining licensure and completing a minimum of two (2) years of clinical experience, they will be awarded the Tinnitus Care Provider certificate.

*Interested participants should review their state/provincial rules and regulations regarding permissible practices related to tinnitus management.

(*Id.*) (italics in original).

## III.    Defendants' Challenges

Defendant challenges all of the claims asserted by Plaintiff, and makes numerous arguments.

### A.    Does Plaintiff Have Constitutional Standing To Pursue Its Claims Against Defendant In This Action?

"To establish Article III standing, the plaintiff must allege that: (1) he has suffered an injury-in-fact that is both '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical'; (2) the injury if fairly traceable to the defendant's conduct; and (3) it is likely that the injury will be redressed by a favorable decision." *Binno*, 826 F.3d at 344 (citations omitted).

"In the case of a plaintiff seeking equitable relief," as ADA does here, "the claimant must allege 'actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review.'" *Binno*, 826 F.3d at 344 (citing *Daubenmire v. City of Columbus*, 507 F.3d 383, 388 (6th Cir. 2007)). Again, in reviewing a challenge to standing, the Court considers just the complaint and its attachments. *Binno*, 826 F.3d at 344.

14

In its motion, Defendant IHS asserts that Plaintiff ADA lacks standing, arguing that: 1) ADA lacks standing to sue on its own behalf; and 2) ADA lacks standing to sue in a representative capacity.

### 1.    Does Plaintiff Have Standing To Sue On Its Own Behalf?

In paragraph two of its Complaint, ADA states that it "brings this action in its organizational capacity to further its objectives and those of its members in connection with the treatment of tinnitus, including those concerning high ethical standards and the protection of the public." (Compl. at ¶ 3).

In its opening Brief, Defendant takes the position that to the extent that ADA is suing on its own behalf, it lacks standing to do so. Defendant asserts that "ADA does not have standing to sue on its own behalf because it has not alleged a 'concrete or 'particularized' injury, but only a generalized interest in 'high quality' health care." (Def.'s Motion at 4). Defendant's brief states that "ADA alleges that its interest in ensuring 'the provision of ethical and high quality hearing health care to the public' will be harmed (complaint, paras. 24, 32, 41, 48, 53). ADA's generalized interest in ensuring provision of 'ethical and high quality health care' is not sufficient to establish a 'concrete and particularized' injury." (Def.'s Br. at 4-5). Thus, in challenging the ADA's own standing, Defendant looked to the few allegations in the Complaint about the harm that ADA itself would suffer and claims that alleged harm is not sufficient to support standing.

In response, Plaintiff acknowledges that "the standard of review on this Motion to Dismiss is *limited to the four corners of the Complaint and Exhibits*." (Pl.'s Br. at Pg ID 629 n.2) (emphasis added). But on that same page Plaintiff asserts that the ADA itself "will face

15

irreparable harm in the form of costs to respond to the audiology profession and the public about Dealers beginning to offer tinnitus care with the Certificate to Dealers" (Pl.'s Br. at Pg ID 629) – although ADA's Complaint contains *no such allegations*.  In another section of its brief, Plaintiff asserts that "ADA has adequately pleaded injury to itself."  (*Id.* at Pg ID 638).  ADA's brief then goes on to assert that an "organization suffers direct injury and has standing when – consistent with its mission – it has had to divert resources to investigate and otherwise respond to the alleged wrongdoing."  (*Id*. at 639).  ADA's brief then discusses cases wherein the "diversion of resources theory" of standing was addressed.

As Defendant notes in its Reply Brief – "ADA has not <u>alleged</u> 'diversion of resources,'" in its Complaint.  (Def.'s Reply Br. at Pg ID 661) (emphasis in original).[2]

The Court concludes that ADA's Complaint simply does not allege any facts that would support a diversion-of-resources theory of standing.   Again, as the party seeking to invoke federal jurisdiction, ADA bears the burden to demonstrate standing and it must plead its components with specificity.  It has failed to do so with respect to its own standing.

## 2.      Does Plaintiff Have Representative Standing To Sue?

To establish associational or representative[3] standing to sue, the ADA must show that: 1) its members would otherwise have standing to sue in their own right; 2) the interests it seeks to protect are germane to its purpose; and 3) neither the claim asserted not the relief requested requires the participation of the individuals in the lawsuit.  *Friends of Tims Ford v. Tennessee*

---

[2]Defendant also asserts that a diversion of resources theory would not be appropriate in this case in any event.

[3]This case involves the standing of a not-for-profit corporation, rather than an association.

*Valley Auth.*, 585 F.3d 955, 966 (6th Cir. 2009); *Heartwood Inc. v. Agpaoa*, 628 F.3d 261, 266 (6th Cir. 2011).

In its motion, IHS argues that ADA cannot meet that first requirement, because the individual members of ADA lack standing to sue under the facts alleged. (*See* Def.'s Motion at 6).  IHS correctly notes that in order for an individual member to have standing to sue, ADA must still allege the basic *Lujan* standing requirements.

ADA, as the party invoking federal jurisdiction, bears the burden to demonstrate standing and it must "plead its components with specificity."  *Binno,* 826 F.3d at 344.

As explained below, the ADA has failed to establish standing because it has failed to sufficiently *allege* the injury-in-fact component, and because it is not likely that Plaintiff's claimed injury will be redressed by the injunction sought here.

### a.    Injury-In-Fact

"To establish Article III standing, a plaintiff must first demonstrate that he has suffered an injury-in-fact that is both 'concrete and particularized' and 'actual or imminent,' *Lujan*, 504 U.S. at 560-61, 112 S.Ct. 2130, based on facts that are both 'specific' and 'concrete.'  *Warth*, 422 U.S. at 508, 95 S.Ct. 2197.  Conclusory allegations do not satisfy the requirements of Article III."  *Binno*, 826 F.3d at 344.

Here, in terms of the injury that the ADA's members will suffer, ADA's Complaint alleges as follows:

> "As to Dealers licensed by Michigan and every other State except North Carolina, the Certificate will falsely or misleadingly convey to the public that the Dealer holding it is legally permitted to provide tinnitus care. *There is a substantial risk that such Dealers will display and advertise the Certificate to the public, resulting in members of the public seeking tinnitus care from them and being provided such care illegally*."  (*Id.* at ¶ 22) (emphasis added).

17

"The Program will not provide Dealers with sufficient knowledge and skill to provide appropriate tinnitus care, given their limited education, training and experience. For that reason, the Certificate will falsely or misleadingly convey to the public that the Dealer holding it is competent to provide tinnitus care. *There is a substantial risk that such Dealers will display and advertise the Certificate to the public, resulting in members of the public seeking tinnitus care from them and receiving inadequate such care.*" (*Id.* at ¶ 23).

"The public will thus be harmed by the issuance of the Certificate to Dealers. *The members of ADA will be harmed by the diversion of tinnitus care patients to Dealers holding the Certificate.* The organizational purpose of ADA to ensure the provision of ethical and high quality hearing health care to the public will be defeated*.*" (*Id.* at ¶ 24) (emphasis added).

(Compl. at ¶¶ 22-24) (emphasis added).

Other paragraphs of the Complaint also allege that the "false or misleading statements in the Certificate are material, in that they will likely influence the deceived consumers' purchasing decisions," followed by a conclusory allegation that "ADA and its members will be damaged by the issuance of the Certificate to Dealers." (*See* Compl. at ¶¶ 31-32, 40-41, 48, 53).

IHS contends ADA has not alleged that a member of ADA has an injury-in-fact. In discussing the injury-in-fact component of standing it asserts:

ADA has not alleged a 'concrete and particularized' injury to individual members. *Lujan, supra*. ADA alleges that its members 'will be harmed by the diversion of tinnitus care patients to Dealers holding the Certificate' (complaint, para. 24). ADA has not actually alleged that advertising itself, rather than issuing or holding the certificates, will cause injury, or that such 'diversion' actually will, or is likely to, result in lost sales to audiologists. Cf. *Lexmark, supra* (allegations of lost sales and damage to business reputation are sufficient to establish Article III standing for a Lanham Act claim.

(Def.'s Br. at 6).

In responding to the motion, ADA asserts that "ADA's members directly compete with Dealers in the hearing healthcare industry. Should the Certificate be issued, ADA members will plausibly suffer competitive injury due to the Certificate's false and misleading statements. In

18

fact, ADA has *alleged the most direct competitive harm: loss of business customers and financial revenue.*"  (Pl.'s Br. at 10) (emphasis added)*.  But ADA's complaint does not actually include those allegations.*  That is, the Complaint: 1) does not allege that ADA's members directly compete with Dealers in the hearing healthcare industry; 2) does not allege that ADA members will suffer competitive injury; and 3) does not allege that ADA's members will suffer a loss of business customers or a loss of financial revenue.  Rather, it only alleges that there "the members of ADA will be harmed by the *diversion of tinnitus care patients to Dealers* holding the Certificate."

The Court notes that ADA alleges diversion of tinnitus care patients to Dealers; it does not actually allege that there will be diversion away from ADA's members and to Dealers.  And while it may seem like patients looking to Dealers for tinnitus care may impact members of ADA such as audiologists[4], that is not necessarily the case and that cannot be assumed when it is not alleged.  In its Reply, IHS explains:

> ADA cannot establish Article II standing on behalf of its members.  ADA alleges that they 'will be harmed by the diversion of tinnitus care patients' but cannot establish a concrete, imminent injury, where it has <u>not</u> alleged that 'diversion' will result in lost sales.  This is an important distinction, because 'lost sales' would result only if the number of licensed individuals available to provide tinnitus care exceeds the amount of services sought (which ADA has not alleged).

(Def.'s Reply at 1).

In other words, audiologists will only be harmed if tinnitus patients start turning to Dealers for tinnitus care if there are more care givers offering tinnitus care than there are patients

---

[4]Again, while ADA's Complaint alleges that IHS's members are mostly dealers, it does not include allegations about its own members, the educational degrees or licenses they hold, or the services they offer to patients.

looking for tinnitus care (ie, if there is actual competition for those patients). IHS's brief in response to ADA's Renewed Motion for Preliminary Injunction asserts that is just not the case, arguing that "the need for devices and other non-medical management for the approximately 30 million American tinnitus sufferers outweighs the number of licensed audiologist and hearing instrument specialists available to provide such care and relief (Beall declaration, paras. 11, 28-29; Lewis declaration, paras. 11, 28-29)." (Def.'s Response to Motion at ¶ 32).

In its Reply Brief in support of it Renewed Motion for Preliminary Injunction, ADA notes this point in a single paragraph. It asserts that "IHS's position rests on the mistaken contention that the tinnitus care market is infinitely expandable," and asserts that Dr. Engelman "expressly dispels this theory and opines credibly that the effect of the Certificate will be to substitute Dealers to the detriment of Audiologists in a limited existing tinnitus care goods and services market." (Pl.'s Reply Br. at 6). ADA asserts that it is prepared to present evidence regarding that contention.

Notably, however, ADA does not direct the Court to any *allegations* in its Complaint as to that issue. And ADA has not sought to amend its Complaint to include such allegations – even after IHS noted and highlighted that it had not pleaded such allegations.

### b.      Redressibility

"The third prong of an Article III standing analysis considers whether it is likely that the plaintiff's injury will be redressed by a favorable decision." *Binno*, 826 F.3d at 345.

Here, the only relief sought by ADA is an injunction prohibiting IHS from issuing the

Certificates to some[5] of the people who attended IHS's training program.

IHS contends that ADA's claimed injury (diversion of tinnitus care patients to Dealers) will not be addressed by the requested injunction.  It asserts that "[t]he injunctive relief sought would not prevent hearing instrument specialists from providing or advertising tinnitus care, or stating to the public that they have successfully completed a tinnitus care program and examination.  ADA's allegations fail to demonstrate how preventing issuance of certificates would remedy 'diversion' of tinnitus patients."  (Def.'s Br. at 7).

In *Binno,* a legally blind individual filed suit against the American Bar Association ("ABA"), under the Americans with Disabilities Act after applying unsuccessfully to several law schools.  Binno claimed that his "lack of success was due to a discriminatory admissions test 'mandated' by the ABA," the LSAT.  *Binno*, 826 F.3d at 341.  Binno sought an injunction preventing the ABA from applying Standard 503(which he claimed effectively compelled law schools to require the LSAT).  The district court dismissed the action for lack of standing and the Sixth Circuit affirmed.

In doing so, the Sixth Circuit noted that Binno failed to establish redressability.  *Id*. at 345.  Binno alleged that he was injured by virtue of having to take the LSAT to apply to law schools.  But even if the Court were to grant his "requested relief by somehow making Standard 503 optional, law schools still could choose to require the LSAT in their admissions process.  Because Binno's relief depends on action by the law schools – third parties that are not before the court– a favorable decision by this court is not likely to redress Binno's injury."  *Id.*

---

[5]ADA states that it does not oppose a Certificate being issues to any audiologists, or other participants with the same or better training, who attended IHS's training program.  (D.E. No. 12 at Pg ID 139).

The same is true here.  ADA's Complaint alleges that there is a substantial risk that Dealers who would receive a Certificate from IHS would display or advertise the Certificate to the public, "resulting in members of the public seeking tinnitus care from them," and that members of the ADA will be harmed by the diversion of tinnitus patients to Dealers.  (Compl. at 10-11).

Thus, the claimed injury to ADA's members is the diversion of tinnitus patients to Dealers.  But even if this Court were to enjoin IHS from issuing the Certificates, that would do nothing to prevent any of the Dealers who attended the December 2016 program from advertising to the public, or in materials displayed in their offices, that they completed the training program sponsored by IHS or that they passed the examination given by IHS following the program.

The key point is not that Dealers could still generally advertise that they treat tinnitus even if the injunction is issued; it is that they could still specifically advertise that they completed the training program sponsored by IHS and passed the exam given by IHS (ie, they can advertise the very substance of what the Certificates would presumably[6] say) even if the requested injunction is issued.

Thus, similar to the situation in *Binno,* even if this Court were to grant the requested injunction preventing IHS from issuing the Certificates (a piece of paper presumably saying that a Dealer attended the IHS program and completed the IHS examination), Dealers can still choose to *advertise that very same information to the public*.  As such, the requested injunction in this

---

[6]The actual Certificates have not yet been drafted, so there is no actual language for the Court to consider.

action is not likely redress the ADA's members' claimed injury, tinnitus patients turning to Dealers for treatment.

Accordingly, the Court concludes that Plaintiff's Complaint must be dismissed because Plaintiff has failed to establish Constitutional standing to bring this action. As result, the Court shall deny Plaintiff's Motion for Preliminary Injunction as moot.

**B.      12(b)(6) Challenges To Plaintiff's State-Law Claims**

Given that the Court is dismissing this action for lack of standing, the Court need not consider Defendant's additional challenges, which are made under Fed. R. Civ. P. 12(b)(6). Nevertheless, the Court concludes that Plaintiff's claims would also be properly dismissed as to those challenges.

**1.      Michigan Consumer Protection Act Claim**

In Count III, ADA asserts a state-law claim under Michigan's Consumer Protection Act, Mich. Comp. Laws § 445.903 *et seq.* ("the MCPA"). Specifically, ADA alleges that the "issuance of the Certificate to Dealers" will be a deceptive, unconscionable or deceptive method, act and practice, in violation of Mich. Comp. § 445.903(1)(a)-(c). (Compl. at 14).

In its Motion to Dismiss, Defendant asserts that Plaintiff's MCPA claim must be dismissed for several reasons.

The Court agrees that the count must be dismissed because the conduct at issue here does not involve consumer purchases; instead it involves the issuance of a certificate in connection with a business seminar. The MCPA provides, in pertinent part, as follows:

> (1) Unfair, unconscionable, or deceptive methods, acts, or practices *in the conduct of trade or commerce* are unlawful and are defined as follows:
> (a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

23

(b) Using deceptive representations or deceptive designations of geographic origin in connection with goods or services.
(c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.

Mich. Comp. Laws Ann. § 445.903 (emphasis added).

The MCPA defines "trade or commerce" as "the conduct of a business providing goods, property, or service *primarily for personal, family, or household purposes*." Mich. Comp. Laws § 445.902(g) (emphasis added). As the Sixth Circuit has recognized, that "definition, then, creates an exception to the Act's coverage: if a consumer – whether a business or a natural person – buys a good, property, or service for a business purpose – that is, not 'primarily for [a] personal, family, or household purpose[ ]' – then the Act does not apply." *MacDonald v. Thomas M. Cooley Law School*, 724 F.3d 645, 660-61 (6th Cir. 2013).

Here, Plaintiff's Complaint does not include any allegations about any goods or services offered by Defendant that were purchased by others for primarily personal, family, or household purposes. Rather, Plaintiff bases the MCPA count on Defendant having offered a certificate of completion to participants of its professional business training program. Count IV fails to state a MCPA claim against Defendant and must be dismissed.

Count IV, Unfair Competition under Michigan Common Law, is Plaintiff's other state-law claim. In its Motion, Defendant notes that unfair competition claims under Michigan's common law are analyzed similarly to Lanham claims. (Def.'s Br. at 25) (citing *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1104 (6th Cir. 1991).[7]

---

[7]Plaintiff also agrees that its unfair competition under Michigan common law is analyzed the same as its Lanham Act claims. (*See* Pl.'s Renewed Motion for P.I. at Pg ID 152-53).

Defendant's motion therefore does not make additional arguments as to Count IV.  Rather, its arguments as to Count IV are the same as those that follow, made as to the Lanham Act claims.

### 2.    Does Plaintiff Fail To State A Claim Under The Lanham Act?

In addition to its standing challenges, IHS also asserts that ADA fails to state a claim under the Lanham Act.  IHS asserts that ADA fails to state a claim under the Lanham Act for several reasons.

Section 1125(a) of the Lanham Act "creates two distinct bases of liability: false associations, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."  *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S.Ct. 1377 (2014).  In this action, ADA does not assert a false association claim.  ADA alleges only false advertising under § 1125(a)(1)(B).  Section 1125(a)(1)(B) provides:

> (a) Civil Action
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
> . . . .
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

### a.    Is Plaintiff A Proper Plaintiff Under The Lanham Act?

In *Lexmark*, the Supreme Court went beyond Article III, constitutional standing, to

address the limits of who may sue for false advertising under the Lanham Act. *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S.Ct. 1377 (2014). That is, the Court concluded that not every person who is able to meet Article III standing requirements will be permitted to bring suit under § 1125(a). *Id*. at 1388. Rather, the application of the "zone-of-interests test" and a proximate-cause requirement supply the relevant limits as to who may sue for false advertising under the Lanham Act. Failure to meet either test is fatal to the plaintiff.

The Supreme Court "h[e]ld that to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id*. at 1390.

A cause of action is also "limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Id*. The "proximate cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id*. In *Lexmark,* the Supreme Court "h[e]ld that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1391.

In its motion, IHS argues that ADA cannot meet either the zone-of-interest test or the proximate cause test set forth by *Lexmark.*

IHS argues that *Lexmark* does not permit a false advertising claim to be brought in a representative capacity. ADA's response contends that is not true – but does direct the Court to any post-*Lexmark* cases where a false advertising claim under the Lanham Act has been allowed to be brought under a representational capacity. (*See* Pl.'s Br. at 7-9).

26

But even if ADA can bring suit in a representational capacity, the Court agrees with IHS that it cannot meet either test.

As addressed previously in this Memorandum, ADA has not actually alleged that its members will suffer a competitive injury (ie, that ADA's members will lose business customers or lose financial revenue).

Moreover, the concludes that IHS also has a solid argument that the proximate cause test is not met either:

> ADA also has not alleged that any injury to ADA – or even any commercial injury to ADA's members – will 'flow directly' from 'advertising' by IHS.  ADA does not even allege that defendant IHS itself is 'advertising,' and its claim is indirect – that IHS will issue certificates to nonparties who will then use them to 'advertise' the nonparties' business interests.  This is not an injury 'flowing directly from the deception wrought by the defendant's advertising' under *Lexmark*.

(Def.'s Br. at 11).

### b.     Do Plaintiff's Allegations Otherwise Fail To Meet The Elements Of A Claim For Injunctive Relief Under § 1125(a)(1)(B)?

The Sixth Circuit has also established a five-part test for establishing a false advertising claim under the Lanham Act:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; 5) there is some casual link between the challenged statements and harm to the plaintiff.

*Grubbs*, 807 F.3d at 798 (citing *American Council of Cert'd Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc*., 185 F.3d 606, 613 (6th Cir. 1999)).

IHS asserts that ADA's allegations do not meet that test, making a number of arguments:

27

1) that ADA does not adequately allege false or misleading representations of fact; 2) that ADA fails to identify the "intended audience" or allege that false or misleading statements will tend to deceive a substantial portion of" that "intended audience"; and 3) that ADA fails to allege economic or reputational injury "flowing directly' from advertising by IHS, or that "deception" will cause consumers to withhold trade from ADA or its members.

Given the Court's ruling as to standing, the Court will not address all of those additional arguments.

The first argument, however, appears to be another appropriate ground for dismissal of ADA's Complaint. It also highlights what this case is really about.

The first element that ADA must allege and prove is that IHS "has made false or misleading statements of fact concerning his own product or another's." As explained by the Sixth Circuit, " a Lanham Act claim must be based upon a statement of fact, not of opinion." *American Council of Cert'd Podiatric Physicians and Surgeons,* 185 F.3d at 614.

Here, ADA alleges that the Certificates "will falsely or misleadingly convey to the public" that the Dealer holding it: 1) is legally permitted to provide tinnitus care; and 2) is competent to provide tinnitus care. (Compl. at ¶¶ 22-23).

As IHS notes, because the Certificates at issue have not yet been drafted, "ADA has not alleged any specific statement that is likely to lead anyone to conclude that there is 'legal permission' or 'competence' to provide" tinnitus care. (Def.'s Br. at 15).[8]

---

[8]IHS's brief states that IHS will stipulate, as to any Certificates it will issue, that they will "not contain any explicit statement that the holder of the certificate is licensed by any particular state to provide tinnitus care, or has 'legal permission' from a state government to provide tinnitus care, or is generally 'competent' to provide tinnitus care." (*Id*. at 15 n.4). But that is not acceptable to ADA.

IHS's motion states that, as to "'legal permission,' ADA must be claiming that the mere issuance of certificates – regardless of content – implies that all recipients have 'legal permission' from their state governments to provide tinnitus care." (Def.'s Br. at 15). IHS asserts that theory fails, explaining:

> "False advertising' claims based on allegations of implied governmental approval have not been allowed, for the law does not impute representations of government approval...in the absence of explicit claims.' *See Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993) (claim that the act of placing a drug on the market with package inserts often used for FDA-approved drugs falsely implies that the drug has received FDA approval, in the absence of a specific statement reflecting 'FDA approval,' is 'too great a stretch under the Lanham Act'); *Avon Products, Inc. v. S.C. Johnson & Son, Inc*., 984 F. Supp 768, 796 (S.D. N.Y. 1987); *Boston Cab Dispatch, Inc. v. Uber Technologies, Inc*., 2014 U.S. Dist. Lexis 42068 (D. Mass 2014) (plaintiffs fail to allege a specifically offending statement that Uber is 'acting lawfully,' and such a statement will not be implied) (Ex D).
>
> Courts have expressed concern that plaintiffs bringing such 'implied' governmental approval claims are attempting to use the Lanham Act as an alternative vehicle by which to indirectly enforce other government regulations. *See Mylan, supra* at 1139 (permitting plaintiff to proceed on a theory that the act of placing a drug on the market with standard package inserts is 'false advertising' would, in effect, permit [plaintiff] to use the Lanham Act as a vehicle by which to enforce the Food, Drug, and Cosmetic Act (FDCA) and the regulations promulgated thereunder'; this represents an attempt, by ingenious pleading, to escape one principle of law by making it appear that another not truly appropriate rule is applicable). ADA here is using the Lanham Act and the theory of implied governmental approval to obtain a broad ruling from this Court regulating the provision of tinnitus care by hearing instrument specialists. That ADA's goal is to enforce limitations on state-regulated scope of practice is demonstrated by ADA's
> allegation that the true harm here is that the public, seeking tinnitus care from hearing instrument specialists, may be 'provided such care illegally' or receive 'inadequate' care (complaint, paras. 22, 23). ADA should not be permitted to enforce, alter, and even create new state licensing/scope of practice requirements (which it otherwise would be unable to do in a private civil action) through an attenuated theory of Lanham Act 'false advertising.'

(Def.'s Br. at 15-16).

In support of its argument, IHS also directs the Court to *American Ass'n of Orthodontists v. Yellow Book USA, Inc*., 434 F.3d 1100 (8th Cir. 2006).  In that case, the plaintiff was a trade organization that represents orthodontists.  It filed suit against a yellow pages publisher, asserting that it is violating the Lanham Act by listing general dentists under the categories "Dentist-Orthodontists) and "Orthodontists (Straightening-Braces")".  The district court dismissed the complaint and the Eighth Circuit affirmed.  In doing so, the Eighth Circuit explained:

> *The Complaint Fails To State a Lanham Act Claim.* This is not a typical Lanham Act claim. AAO's complaint does not allege that a "general dentist" who requests to be included in Yellow Book listings for orthodontists is falsely claiming endorsement by AAO, nor that the dentist is pretending to be an AAO member. Rather, AAO complains because the general dentist who is included in Yellow Book's orthodontist listings is holding himself out as qualified to perform orthodontics services (i.e., to compete with AAO members) when he has not obtained an additional  education pedigree that AAO considers to be a necessary qualification.
>
> Dentistry is a profession heavily regulated by the States, including Missouri. Orthodontics is a sub-specialty of the dental profession. The complaint does not allege that it is illegal in Missouri for a general dentist to perform orthodontic services unless he or she has completed "an accredited orthodontic program." *Thus, AAO seeks an injunction that would usurp the function of the state licensing authorities to determine who may advertise themselves as qualified to provide this type of professional dental services. AAO cites no authority for the proposition that the Lanham Act confers this regulatory authority on the federal courts. We are confident Congress did not intend to do so.*
>
> *Absent a specific state law prohibition against general dentists holding themselves out as orthodontists, the legal determination that any particular dentist is guilty of false advertising by requesting inclusion in the Yellow Book listings for orthodontists requires a detailed analysis of that dentist's qualifications and experience*. As no general dentist is before the court, the injunctive relief requested by AAO "in gross" may not be granted.
>
> For these reasons, the complaint fails to state a claim upon which the relief requested can be granted. Therefore, the district court properly granted Yellow Book's Rule 12(b)(6) motion to dismiss.

*Am. Ass'n. of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1102–03 (8th Cir. 2006) (emphasis added).

Here too, the complaint at issue does not[9] actually allege that it is illegal (ie, that a Dealer who provides tinnitus care is violating a statute by doing so) for a Dealer to provide tinnitus care to patients.  Rather, what ADA alleges is that:

> 16.    Treatment of tinnitus is within the licensed scope of practice of Medical Doctors and Audiologists in Michigan and every other State.  Treatment of tinnitus is not within the licensed scope of practice of Dealers in Michigan and the other states, except for North Carolina.  N.C.G.S.A. § 93D-1.1.

(Compl. at ¶ 16).  Thus, the ADA only alleges that providing tinnitus care is not within the licensed scope of practice of Dealers, other than those in North Carolina.  A full review of the parties' papers indicates the real issue here is that most state statutes are *silent* as to whether or not Dealers can provide tinnitus care. That is, most statutes do not say that Dealers can provide tinnitus care, but they also do not say that Dealers are prohibited from providing such care either. (*See* Pl.'s Br. at 18-19; Def.'s Br. at 18-19).  Indeed, in opposition to the ADA's Motion for Preliminary Injunction, IHS attached a screen-shot from the ADA's website wherein it acknowledges that "No statutes in any states expressly prohibit tinnitus care by Dealers."  (Ex. C to Def.'s Br.).

Analogous to *Am. Ass'n of Orthodontists*, the ADA is asking for an injunction in this case, under the guise of the Lanham Act, in order to have the Court usurp the function of the

---

[9]Moreover, even if the ADA had alleged that it is illegal for Dealers to provide tinnitus care, as IHS notes, that is a legal conclusion and the Court need not accept as true legal conclusions.  If the ADA had alleged that it is illegal for Dealers to provide tinnitus care, the Court would then need to look at all of the various statutes and determine, on a state-by-state basis, if it is illegal or not.

31

state licensing authorities to determine whether or not Dealers can provide tinnitus care.  The

Lanham Act does not confer such "regulatory authority on the federal courts."  *Am. Ass'n. of*

*Orthodontists*, 434 F.3d at 1103.

   The ADA's argument that the Certificate would falsely convey that IHS believes that a

Dealer is "competent" to provide tinnitus care does not fare any better.  As explained by the

Sixth Circuit, " a Lanham Act claim must be based upon a statement of fact, not of opinion."

*American Council of Cert'd Podiatric Physicians and Surgeons,* 185 F.3d at 614.

   **3.  Does Plaintiffs' Claim For "Contributory False Advertising" Fail As A Matter Of Law?**

   ADA's second claim is a "contributory" false advertising claim under the Lanham Act.

ADA claims that the issuance of the Certificate by IHS will induce Dealers (other than those in

North Carolina) who receive it to advertise falsely that: 1) they are legally permitted to provide

tinnitus care; and 2) they are competent to provide tinnitus care.

   In seeking dismissal of this Count, IHS notes that a "contributory false advertising" claim

under the Lanham Act has not been adopted by either the Sixth or most other circuits.  IHS also

asserts that such a claim would be inconsistent with *Lexmark*'s formulation of proximate cause,

which requires a plaintiff to plead and prove "economic or reputational injury flowing directly

from the deception wrought by the defendant's advertising."  *Lexmark,* 134 S.Ct 1391.

   In response, ADA asserts that the "Sixth Circuit has and continues to recognize claims

for contributory violations of the Lanham Act."  (Pl.'s Br. at 20).  But the only Sixth Circuit

decisions it cites are cases that *did not* deal with contributory false advertising claims under the

Lanham Act.  Like most other circuits, the Sixth Circuit recognizes a claim for contributory

trademark infringement – but that is not what we are dealing with.

The Eleventh Circuit has recognized a contributory false advertising claim under the Lanham Act and did so after *Lexmark. Duty Free America, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248 (11th Cir. Aug. 7, 2015). But it appears to stand alone in that regard.

Given that the Sixth Circuit has not recognized such a claim, this Court would not allow such a claim to proceed in this action, even if ADA had standing.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion to Dismiss is GRANTED and Plaintiff's Complaint is DISMISSED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Preliminary Injunction is DENIED AS MOOT.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: February 21, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 21, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager